IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 24, 2014

**IN RE SERENITY S.**

**Appeal from the Juvenile Court for Madison County**
**No. 5348178      Christy R. Little, Judge**

_____

**No. W2014-00080-COA-R3-PT - Filed November 24, 2014**

_____


This is a termination of parental rights case brought by the guardian ad litem. The trial court terminated Mother/Appellant's parental rights on the grounds of severe child abuse pursuant to Tennessee Code Annotated Section 36-1-113(g)(4), and persistence of conditions under Tennessee Code Annotated Section 36-1-113(g)(3). The trial court also found, by clear and convincing evidence, that termination of Mother's parental rights was in the child's best interest. Because there is clear and convincing evidence in the record to support both the grounds for termination of Mother's parental rights and the trial court's finding on best interest, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is
Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Joshua Brian Dougan, Jackson, Tennessee, for the appellant, T.S.

Kortney D. Simmons, Jackson, Tennessee, Guardian Ad Litem.

1

## OPINION

## I. BACKGROUND

The minor child at issue in this case, S.G.S.,[1] was born in May 2012 to T.S. ("Mother," or "Appellant"). S.G.S. was born with Triple X Syndrome.[2] Shortly after the child's birth, the Mother's doctor ordered a urine drug screen because of Mother's erratic behavior and her threat to leave the hospital against medical advice. T.S.'s urine tested positive for methamphetamine, and on May 11, 2012, referral was made to the Tennessee Department of Children's Services ("DCS").[3] On that day, DCS "call worker," Zanetta Williamson, spoke with Mother at the hospital. Mother informed Ms. Williamson that "her membrane had ruptured on May 8, 2012; however, she was not admitted to the hospital until May 9,

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

[2] Triple X syndrome (also known as triplo-X, trisomy X, XXX syndrome, 47,XXX aneuploidy) is a form of chromosomal variation characterized by the presence of an extra X chromosome in each cell of a human female. Females with triple X syndrome have three X chromosomes instead of two. Triple X results during division of a parent's reproductive cells and occurs about once in every 1,000 female births. Unlike most other chromosomal conditions (such as Down syndrome), there is usually no distinguishable difference to the naked eye between those with triple X and the rest of the female population. Triple X syndrome most often has only mild effects, or has no unusual effects at all. However, symptoms may include tall stature; small head (microcephaly); vertical skinfolds that may cover the inner corners of the eyes (epicanthal folds); and speech and language learning disabilities, such as dyslexia; or weak muscle tone. The symptoms vary from person to person, with some women being more affected than others. Females with Triple X syndrome are at increased risk of delayed language development, EEG abnormalities, motor coordination problems, auditory processing disorders, and scoliosis. They tend to show accelerated growth until puberty.

[3] Mother's husband, M.S., was declared the child's legal father based upon his marriage to Mother at the time of the child's birth. *See* Tenn. Code Ann. 36-1-102(28)(B). However, DNA test results, admitted as trial exhibit 6, indicate a zero probability that M.S. is S.G.S.'s biological father. Mother testified that she was raped, and that she does not know the identity of S.G.S.'s biological father. In any event, inquiry with the Putative Father Registry did not produce any other claims of paternity for this child, and the trial court made a specific finding, in its December 4, 2013 order terminating Mother's parental rights, that "all reasonable efforts have been made to ascertain the identity of the child's biological father." This finding is not appealed. We note that although the petition to terminate parental rights was brought against both Mother and M.S., M.S. did not participate or appear in the termination proceeding. On December 4, 2013, the Juvenile Court terminated M.S.'s parental rights to S.G.S. by default. He is not a party to this appeal.

2

2012 stating that she had too much to do at home." DCS investigator, Dorthea Brice,[4] was subsequently assigned to S.G.S.'s case. Ms. Brice testified that Mother informed her that she had previously (circa 2005) served three and one-half years in federal prison for manufacturing methamphetamine. At the time Ms. Brice became involved in S.G.S.'s case, Mother was on probation from criminal charges in Gibson County. In interviews with Ms. Brice, Mother denied any illegal drug use during her pregnancy. However, based upon Mother's positive urine test, a nail sample was taken from Mother on May 29, 2012 . The nail test, which was admitted as trial exhibit 1, was positive for both amphetamine and methamphetamine. Also, on May 29, 2012, a sample of the child's hair was sent for drug testing. The results of the test, as set out in trial exhibit 2, showed that the child was positive for both methamphetamine and marijuana. While the results of the nail and hair analyses were pending, Mother had left the hospital with the child.

Following Mother's positive drug screen, the Madison County Metro Narcotics Unit conducted an investigation of Mother's home (where the child was also living at that time) on June 6, 2012. The Narcotics Unit discovered an active methamphetamine lab in a backyard shed on the property. Methamphetamine residue was also found in the bathroom inside the house. Mother was arrested and charged with initiating the process to manufacture methamphetamine, a felony under Tennessee Code Annotated Section 39-17-435. Although the initiation charge was ultimately dropped,[5] Mother was found guilty, following a jury trial, of possession of methamphetamine. For the charge of possession of methamphetamine, Mother received a sentence of eleven months and twenty-nine days of Community Correction. At the time of the hearing on termination of her parental rights, Mother was out of custody on an appeal bond.

Following Mother's arrest, on June 6, 2012, DCS removed S.G.S. from Mother's custody and placed her in the temporary custody of the maternal grandparents. However, this initial placement proved to be unsuccessful, and, on June 14, 2012, the child was placed in the temporary custody of her maternal uncle and his wife, where she has remained since that time.

---

[4] Ms. Brice's first name is listed as Therethra in the transcript of the evidence. It is listed as Dorthea in the trial court's order. For purposes of this opinion, we will use Dorthea.

[5] Mother testified at trial that the methamphetamine was being produced by a "friend" of Mother's who was living with Mother at the time. According to Mother's testimony, this person admitted that the methamphetamine lab was hers, which admission led to the initiation charges against Mother being dropped.

3

On June 11, 2012, DCS filed a dependency and neglect petition in the Juvenile Court of Madison County. On October 16, 2012, the trial court entered an order on the dependency and neglect petition. Therein, the court found that the child was dependent and neglected under Tennessee Code Annotated Section 37-1-129(a) in that she "suffered from abuse and/or neglect," and was the victim of "severe child abuse as defined at T.C.A.37-1-102[(b)](23)(A)(i) and (ii), (B) and (D), perpetrated by [T.S.]." The court further found that it was in the child's best interest to remain in the custody of her foster parents.

As evidenced by Mother's mugshot, which was admitted as trial exhibit 10, sometime between December 31, 2012 and January 2, 2013, she was arrested, in Madison County, for public intoxication. Mother testified that this charge was ultimately dismissed.

On July 29, 2013, the guardian ad litem, Kortney D. Simmons ("Appellee") filed a petition to terminate Mother's parental rights.[6] As grounds for the petition, Appellee alleged: (1) abandonment under Tennessee Code Annotated Section 36-1-113(g)(1) for willful failure to pay reasonable support for the child as defined at Tennessee Code Annotated Section 36-1-102(1)(A)(i), and wanton disregard for the welfare of the child as defined at Tennessee Code Annotated Section 36-1-102(1)(A)(iv); (2) persistence of the conditions that led to the child's removal from Mother's custody under Tennessee Code Annotated Section 36-1-113(g)(3); and (3) severe child abuse under Tennessee Code Annotated Section 36-1-113(g)(4), as that term is defined at Tennessee Code Annotated Section 37-1-102. By order dated July 29, 2013, and upon adjudication of indigency, a lawyer was appointed to represent Mother in this case.

On or about September 9, 2013, as set out in trial exhibit 8, Mother was arrested in Henderson County for felony vandalism for "knowingly caus[ing] damage to the victim's vehicle by throwing a cinderblock against the front windshield busting it and putting large dents in the driver's side/passenger's side door, [and] putting water in [the victim's] gas [tank]." Mother was further charged with vandalism "by damage to the siding on a house trailer," and with domestic assault against her husband, M.S., "by hitting him with a baseball bat." These charges were incurred while Mother was on supervised community corrections. By Affidavit of the Madison County Department of Community Correction, entered on October 21, 2013, Mother was alleged to be in violation of the conditions of her community corrections sentence based upon her arrest on the foregoing charges. In addition to her arrest, Mother was further alleged to be in violation of her community corrections sentence for: (1) "fail[ing] to remain drug free . . .[and] test[ing] positive for Marijuana on September 18,

---

[6] Although DCS was listed as a co-petitioner on the petition, DCS did not, in fact, participate in the prosecution of this case. Accordingly, Ms. Simmons, the guardian ad litem, is the sole Appellee in this appeal.

4

2013;" and (2) fail[ing] to report for [a] scheduled office visit with Community Corrections on September 25, 2013." A warrant was issued for Mother's arrest on October 21, 2013. These charges were pending against Mother at the time of the hearing on the petition to terminate her parental rights.

While the vandalism and domestic assault charges were pending, Mother petitioned the court, on September 13, 2013, to allow her visitation with S.G.S. In her petition, Mother stated, in relevant part, that:

> During some portions of this process, Mother has been incarcerated. . . . At this time, however, Mother is living in stable housing in Madison County. She continues to undergo frequent drug screens, none of which have resulted in a positive finding for any drugs or other illegal substances. Mother is meeting as required with her probation officer and has completed all steps as required to this point in her criminal justice matter. Mother has obtained stable employment.

The guardian ad litem opposed visitation, alleging that "Mother is not a fit and proper caregiver. . . . Since the minor child has been [in DCS custody], Mother has been arrested at least two additional times, [aside from] her Methamphetamine [charges], and has had her probation revoked in Gibson County." Based upon the new criminal charges, the court denied Mother's request for visitation.

On November 5, 2013, the trial court heard the petition to terminate Mother's parental rights. By order dated December 4, 2013, the trial court terminated Mother's parental rights on grounds of: (1) "severe child abuse by the hands of Mother pursuant to T.C.A. §36-1-113(g)(4); and (2) persistence of the conditions that lead to the child's removal from Mother's custody pursuant to Tennessee Code Annotated Section 36-1-113(g)(3). The court also found, by clear and convincing evidence, that termination of Mother's parental rights was in the child's best interest.

## II. ISSUES

Mother appeals. She raises two issues for review, which we restate as follows:

> 1. Did the trial court err in finding clear and convincing evidence to support the grounds for termination of Mother's parental rights?
> 2. Did the trial court err in finding that terminating Mother's

5

parental rights was in the child's best interest?

## III.  STANDARD OF REVIEW

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash–Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn.1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash–Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004–01572–COA–R3–PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends on the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *McCaleb v. Saturn*

*Corp.*, 910 S.W.2d 412, 415 (Tenn.1995). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker*, 957 S.W.2d at 837; *McCaleb*, 910 S.W.2d at 415; *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

## IV. GROUNDS FOR TERMINATION OF MOTHER'S PARENTAL RIGHTS

### A. Severe Child Abuse

In Tennessee, a court may terminate parental rights when:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined, in relevant part, as:

> The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death.

Tenn. Code Ann. § 37-1-102(b)(21)(A)(i).

A finding of "severe child abuse" in the underlying dependency and neglect action serves two purposes. First, the finding of "severe child abuse" constitutes an independent ground for the termination of parental rights. *See* Tenn.Code Ann. § 36-1-113(g)(4). Second, a finding of "severe child abuse," even if made during a dependency and neglect action, relieves the Tennessee Department of Children's Services of its obligation to preserve and reunify the child with the parents. Tenn. Code Ann. § 37-1-166(g)(4)(A).

In its October 16, 2012 order, the trial court found that the S.G.S. was dependent and neglected under Tennessee Code Annotated Section 37-1-129(a) in that she "suffered from abuse and/or neglect" and was the victim of "severe child abuse as defined at T.C.A.37-1-102[(b)](23)(A)(i) and (ii), (B) and (D), perpetrated by [T.S.]." The trial court's finding of

7

dependency and neglect was based, in part, on the evidentiary deposition of Dr. Lisa Piercey, who is an expert in the area of "child maltreatment." Dr. Piercey's deposition was admitted into evidence, without objection, at the dependency and neglect hearing. Dr. Piercey testified that she had reviewed all of the medical records that were produced at or near the time of S.G.S.'s birth. She stated that Mother's positive urine test could have reflected drug use seven-to-ten days before S.G.S. was born. Concerning the child's hair follicle test, Dr. Piercey stated:

> This hair follicle goes back as long as sixty days. This child was not even three weeks old at the time of this collection. So certainly [it] could have gone back during the pregnancy.

Based upon the timing of the drug screens, Dr. Piercey specifically stated that "both the [M]other's drug screen and the infant's drug screen were consistent with prenatal drug use." Dr. Piercey also stated that given the fact that the child's hair was taken for testing several days after she was born, the positive results of the drug test could also indicate post-natal exposure to drugs.

Concerning the effects of methamphetamine exposure on S.G.S., Dr. Piercey opined that:

> This exposure [to methamphetamine] would be classified as severe physical abuse and from a physician's standpoint my definition of [severe physical abuse] is life threatening at any point[]. . .or potentially life altering, which [this exposure] certainly could be. And the effects we may not know yet.

Dr. Piercey further testified that even one exposure to methamphetamine could produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay, retardation, or severe impairment of the child's ability to function adequately in his or her environment.

In addition to the results of the drug screens, the trial court also based its adjudication of dependency and neglect upon Mother's admission that she used "methamphetamine after her pregnancy." The court noted that Mother denied using any illegal drugs during the pregnancy. However, the court stated that it based its determination on the fact that "Metro Narcotics had found a methamphetamine lab in a shed located in the backyard of [Mother's] home. . . [and the fact that Mother had subsequently been] arrested and charged with initiation manufacturing methamphetamine, possession of methamphetamine and child endangerment."

8

The trial court's October 16, 2012 order specifically states that it is a final order regarding the disposition of the child as dependent and neglected on the ground of severe child abuse. Mother did not appeal the final disposition or the finding of severe abuse. It is well-settled that a court may apply "the doctrine of res judicata to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action." *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App.2012). Accordingly, where a parent "had a full and fair opportunity to litigate th[e] issue [of severe abuse] in the prior suit" and "chose not to appeal the court's order in the prior action," the finding of severe abuse is "a final decision, which the [parent] is barred from challenging." *State Dep't of Human Servs. v. Tate*, No. 01-A–01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. March 31, 1995). Because Mother did not appeal the trial court's finding of severe child abuse within the time allowed by law, the order became a final order and the finding of severe child abuse is *res judicata*. Thus, the trial court did not err in finding that Mother has committed severe abuse for purposes of terminating her parental rights.

## B. Persistence of Conditions

Although only one ground must be proven by clear and convincing evidence to justify termination of parental rights, the Tennessee Supreme Court has directed this Court to review the findings of fact and conclusions of law as to each ground for termination in order to avoid unnecessary remand. *See In re Angela E.*, 303 S.W.3d 240, 251 n. 14 (Tenn.2010). Accordingly, we will consider the issue of whether the evidence clearly and convincingly supports the finding of persistence of conditions.

The ground of persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early

9

integration into a safe, stable and permanent home.[7]

Tenn. Code Ann. § 36–1–113(g).

The goal of the persistence of conditions ground is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate his or her ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App.2010). Persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005). The question before the court is "the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care...." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

The persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 877. As noted above, the trial court adjudicated S.G.S. to be dependent and neglected by order of October 16, 2012, and that order was not appealed.

In addition to a previous adjudication of dependency and neglect, in order to terminate parental rights on the ground of persistence of conditions, each of the statutory elements that make up the ground known as persistence of conditions must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539, 550 (Tenn.2002). Concerning the ground of persistence of conditions, in its order terminating Mother's parental rights, the trial court found, in pertinent part, as follows:

---

[7] We note that termination on the ground of persistence of conditions usually implicates DCS's obligation to demonstrate that it made reasonable efforts to reunite the child and parent. *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, n. 27 (Tenn. Ct. App. Mar. 9, 2004). When DCS's obligation to make reasonable efforts is implicated, DCS must prove by clear and convincing evidence that it made reasonable efforts. *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App.2008). However, because Mother was found to have committed severe child abuse, DCS was relieved of making reasonable efforts toward reunification with Mother in this case. Tenn. Code Ann. § 37-1-166(g)(4)(A) (providing that DCS may be relieved of its duty to make reasonable efforts after a court finds "aggravating circumstances," including "severe child abuse"). Accordingly, we will not address the question of reasonable efforts on the part of DCS in this appeal.

27. The Court further finds by clear and convincing evidence that [the ground of] persistence of conditions has been met.

28. The Court finds that pursuant to T.C.A. §36-1-113(g)(3): The child has been removed from the home of the parent by order of the court for a period of six (6) months and: (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s), still persist; (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) in the near future; and (C) The continuation of the parent and child's relationship greatly diminishes the child's chance of early integration into a safe, stable and permanent home.

29. The conditions that prevent the return of [S.G.S.] to the mother's home include, but are not limited to: continued drug usage, continued incarceration; and unsafe living conditions.

It is undisputed that the S.G.S.has been removed from Mother's home since June 6, 2012. The now-two-year-old child has been living with her foster parents since she was barely a month old. The trial court found sufficient evidence to conclude that the conditions that led to the child's removal, i.e., Mother's drug use, her continued incarceration, and her unsafe living conditions, still persist and will, in all reasonable probability, subject the child to further abuse if custody is returned to the Mother.

Turning to the record, since S.G.S. was removed from her custody, Mother has tested positive for marijuana use, which resulted in revocation of her appeal bond. In addition, Mother has been arrested for felony vandalism, vandalism, and domestic assault; all of these charges were pending at the time of the hearing on the termination of Mother's parental rights. Concerning the domestic assault charge, Mother testified that she had hit her husband, M.S., with a bat. At the hearing, she further testified that she is still married to M.S., and she expressed no plans to leave him. In addition, Mother testified that her address is the same property where the methamphetamine lab was discovered in the backyard shed. Appellant's daughter, L.S., testified that she and her fiancé live at this property with five children. The residence is a three bedroom home, and L.S. stated that all of the rooms are full. Mother testified that she would find another place to live, or would live in a trailer on the same property if custody is returned to her.

Based upon the totality of the circumstances, we conclude that the ground of persistence of

the conditions that led to the child's removal from Mother's custody are proven by clear and convincing evidence. Given her continued drug use, her pending criminal charges, and her lack of a suitable home for the minor child, it does not appear that these conditions will be remedied at any early date.

## V. BEST INTEREST

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App.1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36–1–101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with

12

the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

Tenn. Code Ann. § 36–1–113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S*., 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36–1–113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

In its December 4, 2013 order terminating Mother's parental rights, the trial court made the following findings concerning the S.G.S.'s best interest:

13

31. The Court finds that Mother has made no adjustment in her circumstances, in that she is currently incarcerated on a methamphetamine conviction out of Madison County, Tennessee and is awaiting disposition of new charges of domestic assault, vandalism and felony vandalism out of Henderson County, Tennessee.

32. The Court finds that there has been no substantial bond established between Mother and child because the child was removed from the home at the age of five-weeks old.

33. The Court also finds that the Mother's current physical environment is neither proper nor safe for the child due to the fact that Mother still resides in the home where a methamphetamine lab was discovered in an outside shed on the property and where methamphetamine residue was found inside of the home.

34. The Court further finds that the minor child needs to reside in a stable, non-volatile home where she is properly cared for, all of her medical and physical needs are met and she is able to thrive.

\*                                    \*                                    \*

39. [S.G.S.] is placed in a home with custodians that wish to adopt her and provide her with permanency.

40. The child has established a strong bond with the [foster parents] and their four children and has "come out of her shell" and "holds her own in a room." [S.G.S.] has become a special part of their family and the children consider her as their little sister.

Although Mother argued during her testimony that she has a bond with S.G.S., the evidence suggests otherwise. As noted above, since the age of five weeks, the child has not been in Mother's custody. Mother testified that she sees S.G.S. "every chance she has," but there is no indication in the record that the visitation has been anything but sporadic. In addition, as discussed in greater detail above, even in the face of losing custody of her child, Mother has continued to embroil herself in actions that have resulted in her arrest and incarceration during the pendency of these proceedings. She has not obtained stable housing, and insists that she and the child will be able to live in a three-bedroom home with seven other people–a home where methamphetamine was being manufactured in the backyard and residue was found inside the home. Furthermore, Mother has expressed her intent to remain with her

14

husband, M.S., despite the fact that there has been a history of violence between M.S. and Appellant.

On the other hand, the child's foster mother testified that the child is thriving in her current environment. The evidence indicates that the child has some special needs, including weekly speech therapy and regular doctor's appointments. The evidence shows that the foster parents are very hands-on with this child. They ensure that S.G.S. not only receives all necessary medical intervention, but they also follow up with any recommendations made by doctors and therapists. The foster mother testified that when the child first arrived in the foster home, at approximately five weeks old, she was withdrawn and slept much more than most children her age. The child had developmental delays that kept her from crawling or walking at the usual age. However, the foster parents have worked with S.G.S., and, at the time of the hearing, the child was thriving in their care. Given the child's medical issues, the foster mother testified that it is imperative for her to be in a stable, non-chaotic environment. From the totality of the circumstance, it does not appear that Mother will be able to provide such environment at any early date. Accordingly, to remove the child from the only stable home she has known would likely have a negative impact on her future development. From the record, and in light of the foregoing factors, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that it is in S.G.S.'s best interest for Mother's parental rights to be terminated.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the trial court. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant/Mother, T.S. Because Mother is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
KENNY ARMSTRONG, JUDGE